SMITH, State Superintendent of Banks, Appellant, v.
DANFORTH, et al, Respondent.

(223 N. W. 59.)

(File No. 6551. Opinion filed January 15, 1929.)

*McNulty, Williamson & Smith,* of Aberdeen, for Appellant.
*R. A. Dunham,* of Clark, for Respondents.

MISER, C. Originally this was a suit on behalf of the Raymond State Bank to quiet title to a half section of land. All the defendants disclaimed any personal interest in the property, but respondent Russell intervened, setting up a vendor's lien and asking other relief. Russell formerly owned the land, and the evidence is undisputed that the bank never paid anything to Russell for the property out of its own assets. The major question is whether Russell is entitled to the vendor's lien, as determined by the trial court.

On October 1, 1917, Russell had contracted to sell the land to defendant Schaller. On March 1, 1921, the unpaid notes given as part of this contract amounted to $13,000. On that day, being heavily indebted to the Raymond State Bank, Schaller resigned as its cashier. He left with defendant Wallace M. Danforth, president of the bank, his contract with Russell. He made no assignment in writing. The trial court found that he "abandoned the said contract to the said bank and for the purpose of transferring to the said bank any profit therein." Wallace Danforth was at that time struggling to keep the bank open, and, although he continued to act as its president until it closed on January 4, 1924, the superintendent of banks had a special examiner in the bank, supervising its affairs from March, 1921, until December, 1922. Defendant Wallace M. Danforth will be hereinafter referred to as Wallace, and his son, Delmer T. Danforth, who was neither an officer, stockholder, nor employee of the bank, will be referred to as Delmer. Defendant Cagley was vice president of the bank.

Some time prior to October 5, 1921, Wallace told the special examiner that he had a chance to sell the farm to defendant Parker on contract for $24,000. On October 5th, with the approval of the special examiner, Wallace, Delmer, and Cagley purchased the land from Russell, and received from him warranty deeds naming Delmer as grantee. The agreed purchase price was $13,000. The evidence is conflicting as to whether the unpaid Schaller notes for that amount were then surrendered by Russell; but, in any event, they were regarded as worthless and ignored.

At the time of the delivery of the deed, Wallace, Delmer, and Cagley executed and delivered to Russell their notes for $7,000 of the $13,000 purchase price, and, with the consent of Russell, Delmer executed and there was delivered to the Modern Brotherhood of

America a mortgage of $6,000 on the land, the proceeds of which were deposited in the bank. This money was not deposited in the name of Russell, nor did he check thereon; but it was understood by the special examiner that it was to be paid to Russell as he needed it. Out of this fund there was sent to Russell by Wallace an aggregate of $3,654.70. Although the balance of $2,345.30 was twice demanded of Wallace Danforth, its president, before the bank closed, it was never paid.

As had been planned by Wallace and the special examiner before the land was purchased from Russell, and as theretofore negotiated with Parker, Parker entered into a written contract with Delmer on October 28, 1921, to buy the land and to pay for it in 20 annual installments. On this contract, Parker paid $1,145.60 up to the closing of the bank, and he paid the further sum of $1,574.44 after the closing of the bank, and up to November 1, 1925, when he abandoned the contract. The former sum was paid to the bank; the latter sum was paid to the examiner in charge, and still remains unexpended in his hands.

On May 29, 1922, Delmer executed and delivered to the bank a warranty deed to the premises. The bank paid nothing for this transfer, nor had the bank theretofore obligated itself in any way for the purchase of the land. On December 29, 1922, Delmer assigned to Wallace, Cagley, and himself the Parker contract, and on the same day they reassigned it to the bank. Both assignments confirm the testimony of Wallace that their notes for $7,000, given to Russell as part of the purchase price of the land, were to be paid out of the moneys to be received from Parker. Of all the foregoing facts, as well as the rights and equities of Russell, the bank at all times had full knowledge. At no time did the bank pay any consideration for any of said transfers, nor did Russell ever receive in actual cash any part of the price for which he sold the land, except that, out of the $6,000 M. B. A. loan deposited in the bank, Russell was sent $3,654.70. None of the money paid by Parker ever reached Russell.

The situation is then as follows: The bank has a fee-simple title to the land, against which there is the M. B. A. mortgage of $6,000, which Russell concedes to be a first lien. Out of the proceeds of the $6,000 mortgage, it has $2,345.30 which the trial court found it had converted to its own use. It has $1,145.60 paid it by

Parker prior to the closing of the bank on January 3, 1924. The examiner in charge has unexpended in his hands $1,574.44 paid by Parker after the bank closed. It seeks to quiet title against Russell, who has received the notes of Wallace, Delmer, and Cagley for $7,000, no part of which has been paid to Russell, and in addition thereto has received from $6,000 proceeds of the M. B. A. loan, deposited in the bank to the account of "Other Real Estate," $3,654.70 thereof. Russell filed no claim against the bank after it closed. Indeed, he testified that, until two days before the trial on June 25, 1926, he did not know that the bank had closed.

The trial court found that no part of the purchase price had been paid, except the sum of $3,654.70; that the balance of the $13,000, plus interest and less said $3,654.70, was $12,384.55; that of this balance Russell was entitled to an equitable lien for the $1,574.44 paid by Parker to the examiner after the closing of the bank, and which sum remained unexpended in the hands of the superintendent of banks; and that, for the remaining $10,710.11, Russell should have a vendor's lien against the premises, which it ordered sold. From the judgment entered thereon, and from the order denying motion for new trial, this appeal is taken.

Section 1689, R. C. 1919, is as follows: "One who sells real property has a special or vendor's lien thereon, independent of possession, for so much of the price as remains unpaid, and unsecured otherwise than by the personal obligation of the buyer."

In discussing section 3046, Civ. Code Cal., which is identical with section 1689, supra, the California court says: "The principle upon which this lien has been established by courts of equity is that a person who has gotten the estate of another ought not, in conscience, as between them, to be allowed to keep it and not pay the full consideration money." Selna v. Selna, 125 Cal. 357, 360, 58 P. 16, 73 Am. St. Rep. 47. See, also, Rogers v. Real Estate Inv. Co., 159 Cal. 735, 115 P. 936, 35 L. R. A. (N. S.) 543; Story's Eq. Jur. (14th Ed.) § 1625.

As to whether the lien is waived by taking the notes of the purchasers, although there are decisions contra, it is usually held that this does not affect the lien, in the absence of an agreement that there should be satisfaction. 35 L. R. A. (N. S.) 91. "The lien is not waived or repelled by the taking of the purchaser's independent obligation or promise to pay the purchase money, such as

his note, * * * as these are regarded as mere evidence of the indebtedness." 27 R. C. L. 576, "Vendor and Purchaser," § 319.

In the case at bar, if Wallace, Delmer, and Cagley were not the buyers, the notes for $7,000 would not be "the personal obligation of the buyers." If they were the buyers, Russell did not waive his lien, if otherwise entitled to it, by taking their notes.

█ Appellant contends that the bank was the buyer. Respondent contends that Wallace, Delmer, and Cagley were the buyers within the meaning of the statute. Both contentions find support in the evidence. Beyond question, it was intended by Wallace, Delmer, and Cagley that the bank should have the prospective profit of $11,000 on the sale, for which negotiations had been made before the land was bought from Russell. Moreover, Russell knew that, although he had deeded to Delmer, the profit on the resale then contemplated was to go to the bank. While it was not contemplated by the Danforths or Cagley that they should have to pay their notes for $7,000, it was fully contemplated that the notes should be paid from the profits of the purchase from Russell and sale to Parker. On the other hand, while the Danforths and Cagley were legally obligated to pay them, any obligation on the part of the bank to pay them, except from the receipts from Parker, was scrupulously avoided. No useful purpose would be served by an extended review of the testimony, much of which is consistent with the theory that the bank was the buyer and much of which was consistent with the theory that Wallace, Delmer, and Cagley were the buyers. The trial court found that the land was sold to Wallace, Delmer, and Cagley; that they were the purchasers thereof; that the bank paid no consideration therefor; that in all the negotiations heretofore set out the Danforths and Cagley were acting for and on behalf of, and with the complete knowledge of, the bank.

As to the testimony which appellant cites as tending to support his theory that the bank was the buyer, and therefore the taking of the notes of the Danforths and Cagley would waive a vendor's lien, the language of the Illinois court in Schoonmaker v. Plummer, 139 Ill. 612, 29 N. E. 1114, quoted by this court in Cook v. Cook, 24 S. D. 223, 227, 123 N.W. 693, 694, is peculiarly apt: "Great reliance, however, seems to be placed upon the testimony of a considerable number of witnesses produced by the complainants, who testified to

various statements by Plummer, both before and after the purchase was made, as to the purposes for which he was about to or had made it. It would serve no useful purpose for us to rehearse the testimony of these witnesses in detail. As to many of them, all we need [to] say is, that what they testify to is not necessarily inconsistent with Plummer's version of the transaction. They testify to statements of Plummer that he was about to purchase or had purchased said house and lot for his daughter. Testimony of this character does not militate against the theory that he bought said property merely for the purpose of furnishing his daughter a home. In a very important sense, such purchase might be said to be made for her." That the Danforths and Cagley intended to pay for this land out of their own funds, and then give it to the bank, is not consistent with the testimony. That they did intend to buy it, make a loan upon it that would bring $6,000 of much-needed cash into the coffers of the bank, sell it at a paper profit of $11,000, give that profit to the bank on condition that their notes should be paid out of the proceeds of the sale, and then give a deed to the bank, is consistent with the testimony and with the findings of the trial court.

Appellant contends that Delmer took the deeds as trustee for the bank. Certainly no trust in this land was created by a written instrument, nor did the bank pay the consideration therefor, but scrupulously avoided becoming obligated for any part of the purchase price; and even after receiving the deed from Delmer, it was not the deed, but the contract with Parker, that was treated by the bank as an asset. To have the bank, which paid nothing, declared the buyer of this property in equity, in order that the bank may thereby defeat Russell's vendor's lien for the unpaid purchase price, is offensive to equity. We are therefore of the opinion that the finding of the trial court that the Danforths and Cagley were the buyers is amply supported by the evidence, and that there is no clear preponderance of the evidence against it.

■■ But appellant contends that, even though originally entitled to a vendor's lien, Russell waived it by his acts. The favor accorded the lien and the amount of proof required to show waiver are shown by the following opinions based on statutes, in the one case identical, and in the other almost identical, with our own:

In Brown v. Kahn, 176 Cal. 159, 167 P. 869, the California

court, after reviewing prior cases, says: "The true doctrine as outlined by these authorities in this state, and as fully sustained by the great weight of authority in other states, would seem to be that in order to constitute a waiver of a vendor's lien there must be some act or omission on the part of the vendor inconsistent with his assertion of the lien and evincing his intention to waive it, and that it must be such an act or omission as would render it inequitable to thereafter attempt to assert it."

The Circuit Court of Appeals of the Eighth Circuit, in Rader v. Star Mill & Elevator Co., 258 F. 599, 604, opinion of Sanborn, cites section 3847, Rev. Laws Okl. 1910, in holding that the legal presumption is that one who has a legal and equitable lien on property intends to maintain and enforce it, and his abandonment thereof may not be adjudged without clear and convincing evidence of his intention to abondon. Section 3847 is the same as our section 1689, R. C. 1919, and Civ. Code Cal. § 3046, with the addition of the words "subject to the rights of purchasers and incumbrancers in good faith, without notice," added thereto. Certainly, if Russell had a vendor's lien, the terse language of our section 1689, as well as the decision of courts of equity, place upon appellant the burden of showing a waiver thereof.

■■ Did the trial court err in finding that only $3,654.70, and not the entire $6,000, proceeds of the M. B. A. mortgage, have been paid to Russell. On this point, the trial court found that Delmer, Wallace, and Cagley agreed with Russell to negotiate a loan of $6,000 on the premises, and to pay over to Russell the proceeds thereof; that the proceeds thereof were placed in the Raymond State Bank; that only $3,654.70 thereof has been paid to Russell; and that appellant bank has used and converted to its own use the balance. The evidence, although not free from conflict, supports these findings. The money was not deposited to Russell's account; but the special examiner says the book entry thereof was either "Other Real Estate" or some other wrong entry. Russell's letters to W. M. Danforth show that he looked to him for the payment of the balance of the $6,000. The bank is in no position to contend, in an equitable suit to quiet title, that the original buyers, through whom its title is deraigned, have paid the vendor the entire $6,000, when $2,345.30 is still retained by the bank. Story's Eq. Jur. (14th Ed.) 1625, 1631, 1637. We do not believe that sec-

tion 1689, which is the statutory enactment of a rule of equity, permits a holding so grossly inequitable.

 Tested by the rule as stated in Braun v. Kahn, supra, the evidence in this case does not show a waiver of the vendor's lien to which Russell was entitled under the clear and explicit language of section 1689. He would, therefore, have been entitled to have adjudged to him a vendor's lien for so much of the purchase price as remained unpaid, unless the lien was lost by the transfer of the title from the buyers to the bank. Inasmuch as the bank, through its president and the special examiner, not only had full knowledge of all the facts, but actively participated in the negotiations with Russell, no equitable reason is apparent why the lien should not be as effective against the property when owned by the bank as when owned by Delmer, Wallace, and Cagley. Story's Eq. Jur. (14th Ed.) §§ 1625, 1631, 1635.

 Appellant also contends that he should not have been ordered to pay over to Russell the $1,574.44 paid by Parker to the examiner in charge after the bank closed. How much of this was paid after the time limited in the notice to creditors for presentation of claims does not appear. All of it was paid after the bank had been taken over by the superintendent for liquidation. Russell presented no claim for the $2,345.30, which was kept by the bank out of the $6,000; nor did Russell present a claim for the $1,145 paid by Parker to the bank, and which should have been paid to Russell before the bank closed. The superintendent was not ordered to pay such sums. All that he was ordered to pay was the $1,574.44, which, by the express language of the assignments of the Parker contract, was to be paid, just as the court ordered it to be paid, to Russell. Russell's right to the $1,574.44 paid by Parker to the examiner in charge after the closing of the bank is not affected by section 8933, R. C. 1919.

The judgment and order denying motion for new trial are affirmed.

SHERWOOD, P. J., and POLLEY and BURCH, JJ., concur.

BROWN, J. (dissenting). I find no evidence in the record from which it can be inferred that Wallace, Delmer, and Cagley purchased the land from Russell. There is no contract in writing between these parties, and there is no oral evidence connecting

Delmer or Cagley with any contract of purchase. The oral evidence shows only a conversation between Russell and Wallace in regard to the matter, at which J. E. Morris, an examiner in charge of the bank, was present. Russell testified as follows in regard to this conversation:

"Mr. Danforth (Wallace) told me that this transaction was being handled for the Raymond State Bank. I insisted upon these notes being signed by Mr. Cagley, W. M. Danforth, and Delmer Danforth for my protection. It was at my request that these notes were signed. I wanted to get all the signatures that I could on it. I asked Mr. Danforth what security they could give me, and he said them three men would sign those notes through the bank, as agents of the bank. He told me they were acting as agents for the bank and that they would sign the notes. * * * I wanted him to give me a first mortgage and he said they could not do it; he would have to have a mortgage to get this $6,000. * * * I understood he was going to mortgage the land on the outside and I was to get the $6,000. I agreed to take a note for the balance that was to be taken. He told me he was negotiating this deal for the bank. I understood he was dealing for the bank. I thought Raymond State Bank was all right as long as it was doing business there. I asked Danforth if the bank would pay me the balance of $7,000; he said the bank would pay. When he told me the bank would pay it, I told him I thought the bank was all right. * * * Then I took these notes, and they were signed by W. M. Danforth and Delmer Danforth and Mr. Cagley. I would not have closed the deal without getting these notes."

Neither Delmer Danforth nor Cagley was present at this conversation, and there is no evidence at all that they ever authorized Wallace Danforth to make any purchase on their behalf, or that they were in any manner to be considered the purchasers of the land. The title was taken in Delmer Danforth's name only for convenience, and, so far from considering himself a purchaser of the land, Delmer objected for a while to having the deed taken in his name, but finally consented, because they told him that the bank could not take the deed, and then apply for the $6,000 it wanted to get on the land. Cagley knew nothing about the transaction, except that they called him in and asked him to sign the notes, and he simply signed where they told him to. Neither he nor Delmer had

any personal connection with the transaction, and neither ever claimed any interest in the land.

Russell does not claim that he ever supposed he had sold the land to Wallace, Delmer, and Cagley, or that they had purchased it. It was explained to him why it was desired to have the deeds for the land run to Delmer as grantee, and he deeded the land with the understanding that it was done for the bank, and that he was taking the notes of W. M. Danforth, Delmer Danforth, and Cagley as security for the purchase price. He thereby waived his right to a vendor's lien. A vendor of real estate may, if he sees fit, take the notes of third parties for the whole of the purchase price, and not look to the vendee at all for any part of it, and when he does so he waives his vendor's lien. "Where the vendor takes the notes or other obligations of third persons for the purchase money, he waives his vendor's lien." 39 Cyc. 1836.

As to the $6,000 that was procured through the mortgage placed on the land, the undisputed testimony is that Russell agreed that Danforth was to get a loan for that amount on the land, and that the money should be paid in to the bank for him, and be paid to him as he needed it. This $6,000 was paid in to the bank for Russell, and whether it was credited to his account on the books of the bank or not, when the bank received it with this understanding, it was equivalent to deposit of $6,000 made to Russell, and his leaving the money or any part of it in the bank simply constituted him a common creditor of the bank, so far as this $6,000 was concerned. In no view of the evidence is Russell entitled to a vendor's lien for this $6,000, and I think the evidence is quite conclusive that he took the notes of Wallace, Delmer, and Cagley as security for the obligation of the bank to pay the purchase price for the land, and thereby waived his vendor's lien as to the entire purchase price.

CAMPBELL, J., concurs in the foregoing dissent.